CRAWFORD, administrator, *v.* CLARK, administrator.

1. Where, in a will probated in 1847, a life-estate was bequeathed to testator's daughter, with remainder to her children, followed by an executory bequest to other legatees in the event she "should die without issue," the issue meant was such children, and not issue at large; and so the failure of issue contemplated was a definite, not an indefinite failure. And the failure contemplated having happened, that is, the donee for life having died childless, the limitation over took effect.

2. A remainder may be created in money; and an executory bequest of money, limited upon a definite failure of issue, is valid. The bequest to the daughter, of the life-estate in the money, which was required by the will to be paid to her when she arrived at twenty-one years of age or married, did not create a separate estate in her, under the law of force when this will took effect; and consequently the marital rights of her husband attached, which, on reducing the fund to his possession, entitled him to its use during her life.

3. The verified return of the testator's executor, made before 1852, approved and ordered to record by the court of ordinary having jurisdiction over the estate, and duly recorded, which showed a payment to all the legatees, including the aforesaid money bequest to the husband of the life-tenant, is admissible as prima facie evidence of such latter payment, in a suit by an executory legatee, upon the death of the life-tenant without leaving children, to recover said money from the administrator of the husband, he being a party in interest and connected with the testator's estate, and the approval and recording of such return under the order of the court of ordinary being a judgment de bene esse which affects him. Evidence showing merely that all the executory legatees consented to the payment by the executor to the husband must be construed as meaning only that such legatees consented that the husband should receive what the law gave him,— the right to the use of the money during his wife's life; and if any release beyond this can be shown, it must be based upon some consideration, in order to bind the executory legatees.

4. The administrator of a remainderman or of an executory legatee may sue the personal representative of the life-tenant (and the husband in this case was a life-tenant pur autre vie) who had in his or her lifetime received a money bequest from the testator's representative.

5. The "surviving children" who were to take the ulterior bequest included the children who survived the testator, other than the daughter who is named as the life-tenant; but their estate was contingent, and vested, not at the death of the testator, but upon the death of the life-tenant without leaving children. Nevertheless, as such estate was not contingent as to the person of the ulterior legatees, it was an estate in each that was transmissible to the legal representatives of

those who died after the testator and before the life tenant. The plaintiff, if he .recovers at all, can only recover the share of his intestate.

Argued October 31, 1899. — Decided June 6, 1900.

Exceptions to auditor's report. Before Judge Butt. Muscogee superior court. June 12, 1899.

*Brannon, Hatcher & Martin,* for plaintiff.
*McNeill & Levy,* for defendant.

SIMMONS, C. J. The litigation in this case is for money bequeathed by Thomas Kimbrough to his daughter Sarah Amanda, under a will probated in 1847. This money, it is claimed, was received from the executor by Benjamin W. Clark, who was the husband of Sarah Amanda and is now the intestate represented by the defendant. The fourth and sixth items of said will, forming in substance one bequest, so far as the question involved is concerned, read as follows: "I give and bequeath to my daughter Sarah Amanda, and after her death to her child or children, . . two hundred dollars in cash, the possession . . to be given when she marries or becomes of the age of twenty-one years." "It is my will and desire, that if my daughter Sarah Amanda should die without issue, that all the property bequeathed by the foregoing items . . shall revert to and be equally divided among my surviving children."

1. Did the daughter of the testator take an estate for life or an estate tail under this bequest? The answer is to be found in the law existing when the will took effect. *Hertz* v. *Abrahams, ante,* 707. The court below sustained the defendant's contention that the bequest created an estate tail in the daughter, which, under our act of December 21, 1821, gave her the absolute fee to the money. We think this decision of the court below is clearly wrong. It can not be disputed that a devise to A, and *after her death* to her child or children (whether she has a child or children at the time of the devise or not), would give a life-estate to A, with remainder in fee to her children then in being or afterwards born. See the resolution at end of Wild's case, 3 Co. (rev. ed.) 290, 6 Co. (old ed.) 17*b*; Woodright *v.* Wright, 10 Mod. Rep. 376; Ginger dem. White *v.* White, Willes, 353; *Miller* v. *Hurt,* 12 *Ga.* 357, 360, where the resolu-

tion in Wild's case is copied in full; *Jones* v. *Jones,* 7 *Ga.* 76; *Jennings* v. *Parker,* 24 *Ga.* 621; *Sharman* v. *Jackson, 30 Ga.* 224; *Herring* v. *Rogers, 30 Ga.* 615; *Sanford* v. *Sanford, 58 Ga.* 259; *Gaboury* v. *McGovern,* 74 *Ga.* 144; *Brown* v. *Brown,* 97 *Ga.* 539.　Such a devise is entirely different from one to A and her children, she then having no children, as is pointed out in Wild's case, and in Ginger dem. White *v.* White, *Miller* v. *Hurt, Sanford* v. *Sanford,* and *Brown* v. *Brown,* supra.　And in 3 Jarman on Wills (Randolph & Talcott's ed.), 184, it is said that a devise "to A and his wife, and *after their death* to their children, . . it is now admitted on all hands, gives an estate for life to the parents, with remainder to their children; so that the notion as to its being an estate tail [is] clearly untenable."　Now this being true, what is the legal meaning and effect of the subsequent words in this will, "if [she] should die without issue," which follow the remainder in fee to the children?　Simply, if she should die without *such* issue, namely, children.　In 3 Jarman, Wills, 256, that learned author says: "It is well settled, also, that words importing a failure of issue (without the word *such*), following a devise to *children* in fee simple or fee tail, refer to the objects of that prior devise and not to issue at large."　On page 260 he quotes as follows from Lord Cottenham: "A gift to A for life, with remainder to the children of A in fee, that is, the children of A in fee generally, and a gift over on the death of A without issue, means such issue, that is, children.　In such cases the general term 'issue' is construed to mean that particular description of issue before specified, namely, children."　The cases cited by him on pages 256-268 amply support his position.　On page 281, after a review of all the cases, favorable to and apparently against this view, he submits the following conclusion or rule: "That the words, *in default of issue,* or expressions of a similar import, following a devise to *children in fee simple,* mean in default of children. . . This is free from all doubt."　In Blackborn *v.* Edgeley, 1 P. Wms. 600, 605 (1719), the devise was to A for life, and after his death to his eldest son in tail; but if A should die without issue, to B.　The court held, Lord Chancellor Parker delivering the opinion, that the words "if he should die without

issue," following the devise in remainder to the son, must be intended "if he should die without *such* issue"—that is, the *son.* And in Goodright dem. Docking *v.* Dunham, Doug. 264 (1779), the devise was to A for life, and after his death to his children; and in case he died without issue, to B.  Lord Mansfield said (p. 267) : "Neither side thought it could be maintained that [A] took an estate tail.  The words 'and in case he dies without *issue*,' being tacked to the preceding clause, must mean the same thing as 'and in case he dies without *children.*'" This case is directly in point.  See also Morse *v.* Marquis of Ormonde, 5 Madd. 99, 113; DeHaas *v.* Bunn, 44 Am. Dec. 201. As the above authorities clearly show that the bequest in the case now under consideration gives an estate for life to the daughter, with remainder to her children; but if she should die without children, then to the testator's other children, the cases of *Miller* v. *Hurt,* supra, *Sanford* v. *Sanford,* supra, *White* v. *Rowland,* 67 *Ga.* 546, and *Haddock* v. *Perham,* 70 *Ga.* 572 (2 and 5), 577, are therefore direct authorities in favor of the plaintiff in error.  And hence it also follows, from these decisions, that the claim of the defendant that the husband of the life-tenant took the bequest as heir of their infant children, the husband and child having both died before the tenant for life, is clearly untenable.  If the bequest in this case had been immediately to the daughter *and* her children (she then having no child); but if she should die without issue, then over, the contention of the defendant in error would have been correct under the cases of *Brown* v. *Weaver,* 28 *Ga.* 378, and *Wiley* v. *Smith,* 3 *Ga.* 551, because an immediate devise to A *and* her children (she having none) would, of itself, be an estate tail under one of the resolutions in Wild's case and under all subsequent authority; and of course a limitation over, after such an estate, upon A dying without issue, would not have made a different estate when the testator in this case died.  But such is clearly not the bequest in the present case, and none of the cases cited for the defendant in error on the question of an estate tail are applicable to it.

2. A remainder can be created in money.  *Thornton* v. *Burch,* 20 *Ga.* 791 (3), 793; *Chisholm* v. *Lee,* 53 *Ga.* 611;

*Phillips* v. *Crews,* 65 *Ga.* 274 (2) ; *McCook* v. *Harp,* 81 *Ga.*
229 ; *Gairdner* v. *Tate,* ante, 456.   In *Phillips* v. *Crews,* where
the law is clearly stated, the court held as follows : " A life-estate
in money, with a remainder over, may be created.   Money may
be lost but it should not be destroyed in the use."   And also
that section 2253 of the Code of 1873 (now Civil Code, § 3088),
prohibiting the creation of a remainder in property that is
destroyed in the use, " does not allude to money but to such
things as perish with the usage."   An executory devise of
money, limited upon a definite failure of issue, is valid.   Pin-
bury *v.* Elkin, 1 P. Wms. 563, 2 Vern. 758 ; Ibid. 766 ; Scott *v.*
Prive, 2 Serg. & R. 59, 7 Am. Dec. 629 ; Rowe's ex'rs *v.* White,
16 N. J. Eq. 411, 84 Am. Dec. 169 ; Smith, Exec. Int. §§ 232,
233.   The will directed that the executor should pay the money
to the daughter, to whom the life-estate was given, when she
should arrive at twenty-one years of age or married.   The
daughter married Benjamin W. Clark.   If the bequest had
given her a separate estate, the will, which was the law for the
executor in this case, expressly required the possession of the
money to be given to her.   In such event he could not hold the
money and pay her only the income thereof.   But as the bequest
did not create a separate estate in the daughter, under the law as
it then stood the marital rights of the husband attached.   *Bryan*
v. *Duncan,* 11 *Ga.* 67 ; *Wade* v. *Russell,* 17 *Ga.* 425, where there
was a bequest of money payable to daughters when they arrived
at twenty-one years of age or married ; and *Andrews* v. *Bon-
ner,* 26 *Ga.* 520.   This gave the husband an estate for life in
the money during the wife's life, with the concomitant right.
of possession, and this imposed upon the executor the duty of
delivering the money to him.

3. The evidence offered by the plaintiff to show the payment
by the executor to the husband of the life-tenant was a return
made under oath of the executor to the court of ordinary hav-
ing jurisdiction of the estate, and approved and ordered re-
corded by that court, and duly recorded, prior to 1852.   This
return was rejected as evidence, on the grounds, that no vouch-
ers accompanied the return and none had been produced ; that
all the money required to be paid to all the legatees under the·

will was lumped by the executor in one item of his return; and that the return was simply a memorandum or statement made by the executor ex parte, and was therefore hearsay as against Benjamin W. Clark, who was not connected with the estate. The act of 1810 required four things after the executor's return was prepared: (1) that it be submitted in term time; (2) that it be verified by the oath of the executor; (3) that it be accompanied with the necessary vouchers; and (4) that the court of ordinary, after examining the return and vouchers, should approbate or reject the return, and, if it was approved, should order the *return* to be recorded. The act of 1820 changed the act of 1810 in one respect, namely, that the return, with the necessary vouchers, could be submitted in vacation to the clerk of ordinary, who could qualify the executor as to the correctness of the return, and, after inspecting the return and vouchers, make a special report thereon to the next court of ordinary. The court then acted on such report, and, if the court approved it, the *return* was thereupon ordered to be recorded. Neither of these acts required the original vouchers to be recorded, but evidently meant that the office of the court of ordinary should be their place of naked deposit, for the acts do not provide for a return of the vouchers to the personal representative. It was the act of January 21, 1852 (Acts 1852, p. 97), which provided for the record of the original vouchers and required the ordinary to return them to the personal representative after they were recorded. Nor did the acts of 1810 and 1820 require copies of the vouchers to be attached to the returns. This was first provided for by §§ 2488 and 2490 of the original code; and the act of April 18, 1863 (Acts 1862-3, pp. 138, 139), amended those sections so as to make it optional with executors, administrators, guardians, and trustees, in making their returns, to attach copies of their vouchers or have their original vouchers recorded and returned to them. When the court of ordinary approved the return which was submitted in the present case and ordered it recorded, it was the act of a court of competent and general jurisdiction over the subject-matter. Of course, if the return had not been verified by the oath of the executor, no presumption could arise in its favor

from the order of the court of ordinary approving it, because the return would show on its face that it was illegal. In other words, it would impeach itself, and would, therefore, not be prima facie evidence of its correctness. *Smith* v. *Griffin*, 32 *Ga.* 102. So, if the return had been verified by the oath of the executor but had never been approved and ordered to be recorded by the court of ordinary, it would not be prima facie evidence of its correctness, because it would then be merely the declaration of an interested party, and would, for that reason, be inadmissible as prima facie evidence. *Hudson* v. *Hawkins,* 79 *Ga.* 274, 278. But when the return, as in this case, was duly verified by the executor and approved and ordered to record by the court of ordinary, and there is nothing apparent upon the return to suggest that it is fraudulent, especially as the law stood before 1852, when the vouchers were not required to be recorded, it is admissible as prima facie evidence in favor of the executor to support his statement of expenditures therein. *Brown* v. *Wright,* 5 *Ga.* 29; *Ragland* v. *Justices,* 10 *Ga.* 65, 68; *Barnes* v. *Stephenson,* 22 *Ga.* 209; *Smith* v. *Griffin,* 32 *Ga.* 102; *Saxon* v. *Sheppard,* 54 *Ga.* 288. In *Ragland* v. *Justices,* supra, the court, speaking of a return duly approved and recorded, said: "It is the judgment of a court of competent jurisdiction, . . . and, as such, it is sufficient to admit the return in evidence." And in *Saxon* v. *Sheppard,* McCay, J., who delivered the opinion of the court, said: "The whole effect of a return to the ordinary turns on the fact that that officer, whose duty and jurisdiction it is to examine and pass upon it, has done so. It is his judgment and not the return which is the evidence." This judgment, in reference to annual or partial returns, is not intended to mean a final, conclusive judgment, but rather a judgment de bene esse which is to be used in proper cases as prima facie evidence; and such is the law in many of the other States. 11 Am. & Eng. Enc. L. (2d ed.), 1310-1319; note, 86 Am. Dec. 143-146. The object of the acts of 1810 and 1820, requiring the returns to be recorded, was "that wards, distributees, legatees, and all other parties in interest may know the condition of, and their rights in, the estate represented by an executor, administrator,

or guardian, as the case may be, and that they (the trustees) may have a perpetual memorial for their protection." *Ragland* v. *Justices,* supra.

No one could doubt that, if Mr. Clark had sued the executor for this money, the return, duly approved and recorded, would have been prima facie evidence of payment in favor of the executor, just as a similar return was decided in *Barnes* v. *Stephenson,* supra, to be such evidence for the purpose of reducing a note that the executor in that case had given the husband for his wife's legacy, and upon which suit was brought by the husband against the executor. Likewise, if the executor, after the death of the wife and life-tenant, could have sued the husband for this money for the use of either the remainderman or executory devisees, the return would in such case be prima facie evidence of payment; for it is the judgment of the court of ordinary, approving and passing to record the return, which is the prima facie evidence in favor of the truth of the return, and a receipt is nothing more than such evidence. Hence we know of no legal or substantial reason why a remainderman or executory legatee, either before or after the executor's death, who is the possessor of the legal title and right of action, may not submit such returns of the executor as prima facie evidence of payment by the executor, in a suit by them to recover the money bequest from the personal representative of the life tenant, who, by reason of his marital rights, had become the tenant pur autre vie, or from his personal representative. The returns are not made evidence in favor of the executor by any statute, and they may be used against him. Section 2490 of the original code, which says, "The return thus allowed and recorded shall be prima facie evidence in favor of the administrator of its correctness," is not a codification of the act of 1810 or the act of 1820 or even the act of 1852, but is a codification of the decisions of this court rendered before 1852 and from that time to the publication of the first code, in cases between parties interested in the decedent's estate and his personal representative. And there is nothing in those decisions which expressly excludes the right of all interested persons other than the personal representative to use such returns as prima facie

evidence of payments made by the personal representative; such as, by heir against heir; by legatee against legatee; by heirs or legatees who are sued by a creditor of the intestate or testator after the death of the personal representative; or by remaindermen or executory legatees who are entitled to bequests of money, when they sue the representative of the deceased life-tenant for such bequests. In such cases it is simply the use of a judgment de bene esse of the court of ordinary as prima facie evidence between parties interested in and connected with the estate. And this ought especially to be the rule where, as in the case now under consideration, a great many years have elapsed since the return was approved by the court of ordinary and duly recorded, and it was shown that the original vouchers could not be found in the office of the ordinary, which was their place of naked deposit under the law of force when the return was made. We therefore think that the return of the executor was admissible for the plaintiff in this case as prima facie evidence only, the effect of which, as decided in *Smith* v. *Griffin,* supra, is " to shift the onus — to establish the fact in issue, unless rebutted by the party sought to be affected by it." Counsel for the defendant admit the payment by the executor, in their written argument, by saying that the evidence shows that the persons entitled to the ulterior bequest, of whom the intestate of the plaintiff in error was one, had consented to the executor's paying the money to Mr. Clark, which, counsel contended, was per se a release of both the executor and Mr. Clark from all liability to them. Of course legatees sui juris can divide the estate among themselves in a manner different from that directed by the will, after the testator's legal debts are paid. But was there in this case any legal agreement to do so? The executor needed no release from the ulterior legatees, because, with or without their consent, the will imposed upon him the duty of paying the principal of this money legacy to the life-tenant when she married, and, of course, to Mr. Clark who claimed it under his marital rights as the husband of the life-tenant; and this is the extent of the right — namely, the legal right — which the ulterior legatees evidently consented that Mr. Clark should have in the money. We find no evidence of a release by these

47

legatees of the *absolute* interest in the money to Mr. Clark; and
if such a release exists, it must be based upon some valid con-
sideration to make it binding on the ulterior legatees. *Bruton*
v. *Wooten,* 15 *Ga.* 570; *Burns* v. *Hill,* 19 *Ga.* 22 (4).

4. That remaindermen or their personal representatives may
maintain an action against the administrator of a life-tenant for
a money bequest which had been received by such life-tenant
from the executor of the testator is not an open question in this
State. *Phillips* v. *Crews,* 65 *Ga.* 274. Hence there is no rea-
son for denying this right to an executory legatee who is enti-
tled to the money.

5. If we are correct thus far, the questions then arise: Who
finally took under the ulterior bequest to the "surviving chil-
dren" of the testator? and what was the nature of the estate so
bequeathed? According to the spirit of the early English de-
cisions and of our own cases, such as *Vickers* v. *Stone,* 4 *Ga.*
461, there is no doubt that the term "surviving children" in-
cluded all the children of the testator who survived him, other
than the daughter who was described as the life-tenant. At
the same time, there is also no doubt that as their estate was
wholly dependent upon the life-tenant dying without children,
which was upon an uncertain event, they took a contingent es-
tate which vested, not at the death of the testator, but at the
death of the life-tenant without children then living. *Olm-
stead* v. *Dunn,* 72 *Ga.* 861, 862; *Payne* v. *Rosser,* 53 *Ga.* 663;
Smith, Exec. Int. §§ 86, 90, 128 et, seq. And such would be
the nature of the estate of the executory legatees if they had
been expressly named in the will. *Olmstead* v. *Dunn,* supra.
The bequest is an executory or future estate and not an executed
or present estate. Blackstone's definition of an executory de-
vise, very frequently cited by courts and adopted by legal
lexicographers, is as follows (2 Com. 172): "An executory
devise of lands is such a disposition of them by will that thereby
no estate vests at the death of the devisor but only on some
future contingency." Therefore an executory bequest is such a
disposition of personalty or money by will that thereby no estate
vests at the death of the testator but only on some future contin-
gency. That a devise or bequest to A for life, and after her

death to the testator's "surviving children," would give the surviving children a vested remainder from the death of the testator (*Vickers* v. *Stone*, supra), has nothing to do with the *time of vesting* applicable to this case, which has an intermediate bequest between the life-estate and the ulterior contingent bequest to the surviving children.　See the clear distinction drawn in *Olmstead* v. *Dunn*, 72 *Ga.* 860-862, on the construction of the fifth item and the fourth and tenth items of the will in that case.　Still, as the contingency was not as to the person of the ulterior legatees, such of the testator's children as died after his death and before the life-tenant had an estate that was transmissible to their legal representatives.　2 Williams, Executors (7th Am. ed), 88 ; 7 Am. & Eng. Enc. L. (2d ed.) 260. See, as to realty, in contrast with personalty, Civil Code, §§ 3101, 3081, 3080, 3357.　The opinion in *Payne* v. *Rosser*, 53 *Ga.* 662, closes with the statement that "the property in contest is all real estate."　The representatives of deceased children of the testator are interested parties with the plaintiff's intestate; and in the event the plaintiff proceeds alone and there is a recovery in the case at all, he can recover no more than his intestate's interest, just as in a case of ejectment a tenant in common suing for the whole property can recover only his own share.　*Sanford* v. *Sanford*, 58 *Ga.* 259 (2) ; *Wilson* v. *Chandler*, 60 *Ga.* 129 ; *Dupon* v. *McLaren*, 63 *Ga.* 470 (2) ; *Baker* v. *Middlebrooks*, 81 *Ga.* 494.　In other words, the plaintiff can not recover the full sum sued for in this case ; but, as to the due share therein of his intestate, the decision of the lower court was erroneous, and the judgment is, therefore,

*Reversed.　All the Justices concurring, except Fish, J., who was absent, and Little, J., who was disqualified.*